UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 3:17-cr-215-J-20MCR

RONALD ANDREWS
_____/

### REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress

Physical Evidence and Statements ("Motion") (Doc. 30), Memorandum of Law in

Support of the Motion (Doc. 38), and Supplemental Memorandum in Support of

the Motion (Doc. 45); United States' Memorandum in Opposition to the Motion

(Doc. 36) and Supplemental Memorandum in Opposition to the Motion (Doc. 46)

(collectively, "Opposition").  The Motion was referred to the undersigned for a

report and recommendation on January 25, 2018, and an evidentiary hearing was

held on February 8, 2018.[2]  For the reasons stated herein, it is respectfully

**RECOMMENDED** that the Motion be **DENIED**.

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Crim. P. 59(b)(2); *see also* 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).

[2] The transcript of the hearing (cited as "Tr." followed by the appropriate page number) was filed on February 12, 2018.  (Doc. 42.)

### I.    Background

In a two-count Indictment, Defendant is charged with possession, with intent to distribute, a Schedule One controlled substance (MDMA, also known as Ecstasy) and possession of a firearm by a convicted felon.  (Doc. 1.)  In the instant Motion, Defendant seeks to suppress all items seized from the vehicle he was operating and from his person, and any statements he made to law enforcement officials on July 28, 2017.  (Doc. 30.)  He argues that the items were seized as a result of a stop and subsequent search of the vehicle and his person without probable cause to stop the vehicle or, alternatively, as a result of a stop followed by undue delay in processing civil traffic citations, in violation of the Fourth Amendment to the United States Constitution.  Defendant further argues that the statements he made following the search of the vehicle were obtained by law enforcement officers subsequent to an illegal stop, detention and search, in violation of the Fourth and Fifth Amendments to the United States Constitution.

### II.    Evidence Presented at the Hearing[3]

---

[3] At the evidentiary hearing, the following exhibits were admitted into evidence: Government's Exhibits 1 (the video of the traffic stop, investigation, and arrest of Defendant), 2 (a screen shot from the video showing the car Defendant was driving), 3 (a photograph of the tint meter reading), and 4 (a photograph of the baggie of marijuana seized from Defendant); and Defendant's Exhibits 1 (the Thrifty Car Rental Agreement), 2 (a photograph of OEC Japanese Express Restaurant), 3 (the menu of OEC Japanese Express Restaurant), 4 (composite photographs of food selections at Edgewood Sandwich Shop), and 5 (a photograph of road signs along Edgewood Avenue).  (Doc. 42 at 7-9, 12, 14, 36, 49-52.)

### A.    Trooper Earrey's Testimony

The Government presented the testimony of Joshua Greg Earrey, who has been a state trooper with the Florida Highway Patrol ("FHP") for seventeen (17) years.[4]  (Tr. 5.)  Trooper Earrey testified that as part of his training, he learned to identify marijuana by sight and smell.  (*Id.*)  He further testified that he conducts approximately a couple hundred traffic stops a year concerning window tint violations.  (Tr. 6.)

Trooper Earrey testified that on July 28, 2017, while on patrol in Jacksonville, Florida, he made a traffic stop on a vehicle driven by Defendant, searched the vehicle, and arrested Defendant that same day.  (Tr. 6-7.)  The contraband he found in the vehicle included MDMA (also known as Ecstasy), some prescription pills (Hydrocodone), marijuana, and a firearm.  (Tr. 7.)  The details of the traffic stop are as follows.[5]

While driving southbound on Edgewood Avenue,[6] Trooper Earrey saw a four-door, silver Nissan Maxima traveling in the opposite direction and noticed

---

[4] Trooper Earrey has spent fifteen (15) years with the Criminal Interdiction Unit. (Tr. 5.)

[5] Trooper Earrey's marked vehicle was equipped with two cameras, which recorded the traffic stop.  (Tr. 7.)

[6] Trooper Earrey testified that Edgewood Avenue is in Jacksonville, Florida, is not close to the Georgia border, and is not an interstate road.  (Tr. 33.)

3

that it had improper tinting on its side windows.[7]  (Tr. 8.)  The trooper made a

U-turn and activated his emergency equipment in order to stop the car.  (*Id.*)  The

Nissan made a quick, right-hand turn into the parking lot of a restaurant and the

driver (Defendant) exited the vehicle quickly.  (Tr. 8-10.)  Trooper Earrey did not

see whether Defendant signaled when he made the right-hand turn into the

parking lot.  (Tr. 10, 33.)

As Trooper Earrey was making a right-hand turn into the parking lot, he

saw Defendant was already outside the vehicle and was bent over like he was

"messing with something inside the vehicle."  (Tr. 10.)  Trooper Earrey parked

behind Defendant's vehicle and approached him.  (*Id.*)  Because Defendant made

the right-hand turn and stepped out of the vehicle very quickly, the trooper's

suspicion was raised and it appeared to him that Defendant was trying to

separate himself from the vehicle.  (*Id.*)  Therefore, rather than run the plates at

that point, Trooper Earrey asked Defendant to sit back inside the vehicle for

officer safety reasons and to eliminate the possibility of Defendant fleeing on foot.

(*Id.*)

Then, Trooper Earrey approached the vehicle and noticed there was a

small child in the front right seat, without a child car seat.  (Tr. 11.)  As he was

standing at the driver's side window, the trooper smelled a strong odor of raw

---

[7] The car had no front license plate.  (Tr. 9.)  A front license plate is not required
in Florida.  (Tr. 24.)

marijuana and observed little remnants of marijuana around the gearshift center console area.[8]  (*Id.*)  Trooper Earrey observed that Defendant was nervous: Defendant was sweating, his hands were shaking, and the artery in his neck was pulsating.  (Tr. 13.)  Based on Defendant's nervousness, his driving behavior, and quick exit from the vehicle, Trooper Earrey believed he had probable cause to search the car, but did not do so at that time for safety reasons.  (*Id.*)

 Without mentioning the marijuana, Trooper Earrey advised Defendant why he had been stopped – for illegal window tint – and then tested the tint in Defendant's presence.  (*Id.*)  The test equipment showed that the driver's side window had a light transmittance rate of ten percent (10%), which was below the lawful limit of twenty-eight percent (28%), pursuant to Fla. Stat. § 316.2953.  (*Id.*)

Defendant told the trooper that he stopped at this sandwich shop to get food for his son, which aroused the trooper's suspicion because there was already food in the vehicle.  (Tr. 15.)  Defendant explained that this was his food from the hibachi restaurant and that his son wanted finger foods, like chicken nuggets or tenders and fries.  (*Id.*)

Trooper Earrey asked for Defendant's license and registration.  (Tr. 14.) Defendant stated he did not own the car and provided the rental agreement, which was in his girlfriend's name and did not list Defendant as an authorized

---

[8] Due to the chaotic scene at the parking lot, the marijuana was collected only later and was photographed at the FHP headquarters.  (Tr. 11-12.)

driver.  (Tr. 15.)  The fact that the Nissan was a rental vehicle was significant to the trooper because "there's usually some type of criminal activity that's associated with [rental cars that have tint on them]."  (Tr. 14.)  In Trooper Earrey's experience, window tint on rental cars is placed there by third parties, not by the rental car companies.  (Tr. 15.)

The trooper returned to his patrol car with Defendant's license and the rental agreement.  (*Id.*)  As he was walking back to his vehicle, Trooper Earrey looked at the rear of Defendant's vehicle, specifically, at the license plate, twice.  (Tr. 15-16.)  It was a North Carolina license plate.  (Tr. 16.)  Until that moment, Trooper Earrey did not know that Defendant's vehicle had a North Carolina license plate, because his whole attention was on Defendant.  (*Id.*; *see also* Tr. 24-28.)  Trooper Earrey then repositioned his patrol car to completely block the rental car in order "to eliminate a vehicle pursuit, or anything going worse [sic] at that moment."  (Tr. 16-17.)

The trooper ran computer checks, confirming the validity of Defendant's driver's license and the tag on the vehicle.  (Tr. 17.)  He was surprised to learn that Defendant's license was valid because of Defendant's nervousness, driving behavior, and "everything that [the trooper] observed up to that point."  (*Id.*)  The rental car was reportedly registered to Hertz.[9]  (*Id.*)  Trooper Earrey also queried

---

[9] However, according to Defendant's Exhibit 1, the car was rented from Thrifty Car Rental.

6

Defendant's criminal history, which showed drug and weapons charges.  (*Id.*)

Having already decided that he was going to search the rental car, Trooper

Earrey called Trooper Finley with his K-9 unit for backup.  (*Id.*)  Although Trooper

Earrey believed that he already had probable cause to search the rental vehicle,

he knew from experience that drugs and contraband could be stored all over a

vehicle and a dog can pinpoint the location, especially if located on its exterior.

(Tr. 17-18.)

As Trooper Earrey waited for backup, he made some comments of his

encounter with Defendant up to that point, which were captured on the video.  (Tr.

18; Gov's Ex. 1 at 7:00-7:30.)  For example, the trooper stated that Defendant

was very nervous, in fact, extremely nervous; he was driving a third-party rental

car, which had window tint; he "pulled in [the restaurant parking lot] to try to get

out on [the trooper]"; there was plenty of food in the rental car, but Defendant said

his son would not eat that type of food; and there was an odor of marijuana

coming from the rental car.  (*Id.*)

While Trooper Earrey was sitting in his patrol car, Defendant made contact

with him, prompting him to approach the rental vehicle.  (Tr. 18.)  Defendant

asked about the possibility of peeling off the window tint to avoid getting a ticket.

(*Id.*)  Trooper Earrey told Defendant that he was only going to give him a warning.

(*Id.*)  The trooper did not tell Defendant that he had smelled and seen marijuana,

because his intention was to keep Defendant calm until the backup arrived so

7

that he could investigate further.  (Tr. 19.)  Defendant wanted the trooper to speak with someone on the phone, who turned out to be the renter of the vehicle, but the trooper told Defendant that "[s]he has nothing to do with it at this point." (Tr. 18.)

There was some delay with the arrival of backup so Trooper Earrey called Trooper Finley again.  (Tr. 19.)  During that call, Trooper Earrey said that he had smelled marijuana, that there was a small child in the car, and that the car he had stopped was a third-party rental.  (Tr. 20, 31; Gov's Ex. 1 at 16:25-17:05.)  When Trooper Finley arrived without the K-9 approximately 15 minutes later, both troopers asked Defendant to exit the rental car.  (Tr. 17, 20.)  For officer safety, Trooper Earrey conducted a pat-down of Defendant for weapons.  (Tr. 20.)  He felt a bulge, which was consistent with a large amount of folded currency.  (*Id.*)

Trooper Earrey placed Defendant, without handcuffs, into the back of his marked patrol car.  (*Id.*)  Then, the trooper went back to the rental car where Defendant's son was sitting and had the child exit the car.  (Tr. 21.)  The plan was to have the child sit with his father in the back of the police vehicle.  (*Id.*)  When they approached the trooper's vehicle, they saw that Defendant had already switched sides, which the trooper thought was odd.  (*Id.*)  Trooper Earrey asked Defendant to move back to the other side of the vehicle and to pick up his son. (*Id.*)  Once Defendant picked up his son, he forced his way out of the trooper's car, using his son as a shield, and then threw his son at the troopers.  (Tr. 21-22.)

8

After a struggle, the troopers handcuffed Defendant, arrested him, and placed him back in the patrol car.  (Tr. 22.)

After Defendant was arrested, Trooper Earrey went back to the rental car, where he found a grocery bag "loaded with Ecstasy" on the floorboard of the driver's side.  (Tr. 23.)  He advised Trooper Finley that there were drugs in the car and went back to the rental car where he found a gun in the center console.  (Tr. 23, 46.)  The evidence was taken into Trooper Finley's vehicle.  (Tr. 23.)

### B.   Jacquette Brown's Testimony

The defense presented the testimony of Ms. Brown, Defendant's girlfriend. (Tr. 35.)  Ms. Brown rented and paid for the car that Defendant was driving at the time of his arrest on July 28, 2017.  (Tr. 35, 37.)  Ms. Brown had to rent this car because her own car had been in an accident.  (Tr. 38.)  The rental agreement, admitted as Defendant's Exhibit 1, shows that the car was rented for the period July 15, 2017–August 5, 2017.  (Tr. 36.)  Pursuant to the rental agreement, Defendant was not authorized to operate the vehicle, but nevertheless, on that particular day, Ms. Brown allowed Defendant to drive the car.  (Tr. 36-37.)  Ms. Brown testified that the rental car came with the window tint.  (Tr. 38.)

### C.   Defendant's Testimony

The defense also presented the testimony of Mr. Andrews.  (Tr. 39.)  He testified that on July 28, 2017, he wanted to drive the rental car and asked his girlfriend for permission to do so.  (Tr. 40-41.)  Prior to his arrest that day,

Defendant and his son were at a hibachi and sushi place called OEC Japanese Express.  (Tr. 40.)  Defendant's food from OEC was in the car with them.  (Tr. 42.)  Because his son wanted finger foods (like chicken nuggets or tenders, fries, and/or a hamburger), after OEC, they headed to the sandwich shop.  (Tr. 41.)

Defendant testified he did not realize that there was a law enforcement officer behind him until he was already at the parking lot of the sandwich shop and was bending over to get his son out of the car.  (Tr. 42.)  After he handed his driver's license and the rental agreement to Trooper Earrey, Defendant called his girlfriend to let her know he had been stopped.  (Tr. 43.)  Defendant testified that he did not put the window tint on the rental vehicle.  (*Id.*)

On cross-examination, Defendant testified that he did not know why the drugs and the gun were in the car he was driving.  (Tr. 45-46.)  He admitted he had told Trooper Earrey at the time of his arrest that he had received the drugs and the gun from someone named K.D., but stated that he had lied to the trooper in order to throw this person, with whom he had a problem, "under the bus."  (*Id.*)  Defendant also testified that he was not worried about the window tint because the trooper had told him he would get a warning and that he was not concerned about his driver's license because it was valid.  (Tr. 48.)  When questioned about his attempt to run away from the troopers, Defendant stated that he did not try to run, but rather he tried to get out of the car due to claustrophobia and anxiety. (*Id.*)

10

### D. Paul Pinkham's Testimony

The defense also presented the testimony of Mr. Pinkham, an investigator with the Federal Public Defender's Office.  (Tr. 49.)  Prior to the hearing, Mr. Pinkham visited both OEC Japanese Express and the Edgewood Sandwich Shop, and photographed their menus.  (Tr. 50, 52.)  He testified that OEC Japanese Express did not offer any chicken nuggets or tenders, or french fries (Tr. 50), whereas the Edgewood Sandwich Shop, which is on the same block, had chicken tenders and other finger foods (Tr. 52).

### III. Discussion

Defendant seeks to suppress all items seized from the vehicle he was operating and from his person, and any statements he made to law enforcement officials on July 28, 2017.  He argues that the items were seized as a result of a stop and subsequent search of the vehicle and his person without probable cause to stop the vehicle or, alternatively, as a result of a stop followed by undue delay in processing civil traffic citations, in violation of the Fourth Amendment to the United States Constitution.  Defendant further argues that the statements he made following the search of the vehicle were obtained by law enforcement officers subsequent to an illegal stop, detention and search, in violation of the Fourth and Fifth Amendments to the United States Constitution.  The undersigned addresses each argument in turn.

### A. Trooper Earrey Had Reasonable Suspicion to Conduct a

11

**Traffic Stop Because He Personally Witnessed a Traffic Violation**

In order to conduct a traffic stop, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). "A traffic stop is allowed under Florida law where an officer has a reasonable belief that the vehicle's window tinting is in violation of the limits set forth in Florida Statute Section 316.2953." *United States v. Gonzalez*, No. 2:09-cr-29-FtM-29SPC, 2009 WL 3230787, at *1 (M.D. Fla. Oct. 2, 2009) (denying motion to suppress and citing *State v. Moore*, 791 So.2d 1246, 1249 (Fla. Dist. Ct. App. 2001)). Under this statute, it is illegal to operate a motor vehicle with side window tint with a light transmittance of less than twenty-eight percent (28%) in the visible light range.[10] Fla. Stat. § 316.2953.

---

[10] Section 316.2953 of the Florida Statutes provides:
A person shall not operate any motor vehicle on any public highway, road, or street on which vehicle the side wings and side windows on either side forward of or adjacent to the operator's seat are composed of, covered by, or treated with any sunscreening material or other product or covering which has the effect of making the window nontransparent or which would alter the window's color, increase its reflectivity, or reduce its light transmittance, except as expressly permitted by this section. A sunscreening material is authorized for such windows if, when applied to and tested on the glass of such windows on the specific motor vehicle, the material has a total solar reflectance of visible light of not more than 25 percent as measured on the nonfilm side and a light transmittance of at least 28 percent in the visible light range. A violation of this section is a noncriminal traffic infraction, punishable as a nonmoving violation as provided in chapter 318.

(continued...)

As an initial matter, the undersigned finds Trooper Earrey's testimony to be wholly credible. He is a trained law enforcement officer who has extensive experience with the appearance of illegal window tint. (*See* Tr. 6.) While on patrol on July 28, 2017, he observed the side window tint on the vehicle Defendant was driving and believed it was outside the lawful limits. His belief ultimately proved correct when testing showed that the light transmittance of the side window was only ten percent. In light of his training, experience, and personal observation of the illegal window tint, Trooper Earrey was justified in conducting the traffic stop.

Defendant argues that the window tint restrictions set forth in Fla. Stat. § 316.2953 are inapplicable to the vehicle driven by him because it was neither registered nor required to be registered in the State of Florida. It was a rental vehicle obtained from Thrifty Car Rental bearing a North Carolina license tag. Defendant bases his argument on the text of Section 316.2951 of the Florida Statutes, which defines the term "[m]otor vehicle," as used in Sections 316.2951- 316.2957 of the Florida Statutes, unless the context otherwise requires, as "any vehicle as defined in [Section] 316.003,[11] except vehicles used in farm

_____

[10](...continued)
Fla. Stat. § 316.2953.

[11] Section 316.003 states that except when used in Section 316.1001, a "[m]otor vehicle" is "a self-propelled vehicle not operated upon rails or guideway, but not including any bicycle, motorized scooter, electric personal assistive mobility device,

(continued...)

13

husbandry, which is registered or required to be registered in the state."  Fla. Stat. § 316.2951(1).  Defendant asserts that the Florida window tint statute, Section 316.2953, read in conjunction with Section 316.2951, is not confusing, misleading, or ambiguous.  The undersigned disagrees.

As the Government persuasively argues, it would be reasonable for an officer in Trooper Earrey's position to mistakenly assume that Florida's window tint law applies to all cars on the road, including out-of-state cars.  First, Section 316.2953, on its face, appears to apply to "*any* motor vehicle on any public highway, road, or street."  Fla. Stat. § 316.2953 (emphasis added).  Because the term "any motor vehicle" is not defined in the operative statute, it could reasonably be understood to mean what it says: window tint limits apply to "any motor vehicle" on the road in Florida.

Further, the term "motor vehicle" is defined in different ways in different sections of the Florida Statutes.  For example, the definition in Section 320.01 does not make an exception for out-of-state vehicles.  Section 316.003 also does

---

[11](...continued)
personal delivery device, swamp buggy, or moped."  Fla. Stat. § 316.003(40).  For purposes of Section 316.1001, a "motor vehicle" has the same meaning as provided in Section 320.01(1)(a).  Fla. Stat. § 316.003(40).  Under Section 320.01, a "motor vehicle," as used in the Florida Statutes, except as otherwise provided, means "[a]n automobile, motorcycle, truck, trailer, semitrailer, truck tractor and semitrailer combination, or any other vehicle operated on the roads of this state, used to transport persons or property, and propelled by power other than muscular power, but the term does not include traction engines, road rollers, personal delivery devices as defined in s. 316.003, special mobile equipment as defined in s. 316.003, vehicles that run only upon a track, bicycles, swamp buggies, or mopeds."  Fla. Stat. § 320.01(1)(a).

not make an exception for out-of-state vehicles.  Section 316.2951, on which

Defendant relies, applies specifically to Section 316.2953, but its definition of a

"motor vehicle" is not as clear as Defendant suggests.  Specifically, Section

316.2951 defines a "motor vehicle," unless the context otherwise requires, as

"any vehicle as defined in [Section] 316.003, except vehicles used in farm

husbandry, which is registered or required to be registered in the state."  Fla.

Stat. § 316.2951.  As the Government points out, it is not clear whether the

phrase "which is registered or required to be registered in the state" modifies

"vehicles used in farm husbandry" or "any vehicle as defined in [Section]

316.003."  Under the grammatical rule of the last antecedent, a limiting clause or

phrase—here, the phrase "which is registered or required to be registered in the

state"—"should ordinarily be read as modifying only the noun or phrase that it

immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Defendant's

reading of the definition in Section 316.2951 departs from this rule and may not

be obvious to a layperson.

Given the complicated structure of the statutes and the absence of

appellate authority interpreting them,[12] it would be objectively reasonable for a

---

[12] In *United States v. Leal*, Case No. 3:03-cr-31-J-32HTS, 2003 WL 21665126
(M.D. Fla. Mar. 28, 2003), Magistrate Judge Snyder recommended suppressing the
fruits of a search that followed a traffic stop, concluding that Florida's window tint laws
do not apply to vehicles that are not registered or required to be registered in Florida.
*Id.* at *8.  However, this recommendation was never adopted by the Court because, on
the Government's motion, the indictment against Defendants was dismissed.

(continued...)

police officer in Trooper Earrey's position to misconstrue the law. *See Heien*, 135 S.Ct. at 540 ("This 'stop lamp' provision, moreover, had never been previously construed by North Carolina's appellate courts. . . . It was thus objectively reasonable for an officer in Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop.").

Although Defendant argues that Trooper Earrey should have been more diligent in studying the statutes, whether a mistake of law is reasonable is an objective question. *Id.* at 539 ("We do not examine the subjective understanding of the particular officer involved."); *see also United States v. Cunningham*, 630 F. App'x 873, 876-77 (10th Cir. Nov. 24, 2015) ("An officer's subjective understanding of the law is irrelevant; the mistake of law must be *objectively*

---

[12](...continued)
Moreover, this recommendation preceded the Supreme Court's decision in *Heien* and mistakenly assumed that "a mistake of law as to the applicability of a statute will not provide the basis for a valid stop." *Leal*, 2003 WL 21665126 at *7, 9. Further, the officer in *Leal* observed that the vehicle in question had out-of-state plates before conducting the traffic stop, *id.* at *1, whereas, here, Trooper Earrey did not notice the North Carolina plate until after the traffic stop was underway and after he smelled the marijuana (Tr. 11, 15-16.)

Also, by the time Trooper Earrey noticed the North Carolina license plate, there were additional facts that raised his suspicion: rather than stopping when signaled, Defendant took a quick turn off the road; instead of getting his license and the rental agreement ready, Defendant got out of the car quickly and was bent over like he was "messing with something inside the vehicle"; Defendant appeared nervous – he was sweating, his hands were shaking, and the artery in his neck was pulsating; he stated that he stopped to get food for his son, but there was already food in the car; Defendant was driving a rental car with window tint, which, in Trooper Earrey's experience, usually meant that the tint was placed by third parties and "there's usually some type of criminal activity that's associated with that." (Tr. 10, 13-16.)

reasonable."). Further, the relevant question is whether *an officer* in the arresting officer's position, not an attorney or a judge, could reasonably make the mistake. *See Heien*, 135 S.Ct. at 540 ("It was thus objectively reasonable for an officer in Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law."); *see also Cunningham*, 630 F. App'x at 877 ("If the statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake.") (internal quotation marks omitted). Based on the foregoing, the undersigned recommends that it would be objectively reasonable for a police officer in Trooper Earrey's position to misconstrue the law.

However, even assuming that Florida's window tint laws are not applicable to cars registered out-of-state, there was probable cause (or at least reasonable suspicion) to conduct the traffic stop. As the Government points out, when Trooper Earrey first saw the rental car, it was on a city street in the heart of Jacksonville, not near the Florida-Georgia border or on an interstate highway, and its license plate was not visible.[13] These facts provide a reasonable basis to believe that the car was registered, or had to be registered, in Florida, because the general rule is that all cars on the road in Florida must be registered in Florida. *See* Fla. Stat. § 320.02(1) (stating that with certain exceptions, "every

---

[13] There was no license plate on the front of the rental car. (Tr. 9.) A front license plate is not required in Florida. (Tr. 24.)

owner or person in charge of a motor vehicle that is operated or driven on the roads of [Florida] shall register the vehicle in [Florida]").  In sum, Trooper Earrey was justified in conducting the traffic stop.

## B. Even Assuming Defendant Has Standing to Challenge the Search, There Are Independent Reasons to Deny His Challenge to the Search

"To prevail on a claim that evidence was seized in violation of the Fourth Amendment, the defendant bears the burden of demonstrating a legitimate expectation of privacy in the areas searched."  *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984).  Here, Defendant was driving a rental car, but he was neither a lessee nor an approved driver under the rental agreement.  (Tr. 14, 37; Def.'s Ex. 1.)

The Circuits are divided as to whether individuals, like Defendant, who are not listed as authorized drivers in the rental agreement, may challenge the search of the rental car that they are driving.  The Eleventh Circuit has not addressed this precise question conclusively, but the Supreme Court is currently considering it, having recently heard oral argument on the issue. *See Byrd v. United States*, 138 S.Ct. 54 (Sept. 28, 2017) (granting cert.).

In *United States v. Gayle*, 608 F. App'x 783 (11th Cir. Apr. 27, 2015) (per curiam), the Eleventh Circuit recognized that "[t]he Fourth, Fifth, and Tenth Circuits have held that unauthorized drivers of rental vehicles never have standing to challenge a vehicle search."  *Id.* at 788 (citing *United States v.*

18

*Wellons*, 32 F.3d 117, 119 (4th Cir.1994); *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir. 1990); *United States v. Obregon*, 748 F.2d 1371, 1374–75 (10th Cir. 1984).)  However, "the Eighth and Ninth Circuits have held that an unauthorized driver may challenge the search of a rental vehicle if he can establish that he had permission from the authorized driver to use the vehicle."  *Id.* at 788-89 (citing *United States v. Thomas*, 447 F.3d 1191, 1198–99 (9th Cir. 2006); *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998).)[14]  "The Third and Sixth Circuits have determined that an unauthorized driver does not have standing to challenge the search, but has noted the possibility that exceptional circumstances might create the legitimate expectation of privacy."  *Id.* at 789 (citing *United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011); *United States v. Smith*, 263 F.3d 571, 586–87 (6th Cir. 2001).)  In *Gayle*, the Eleventh Circuit determined that it was unnecessary to decide the standing issue, because even if defendant had standing, he could not prevail on his challenge of the search of the vehicle.  *Id.*

Similarly, here, the Court need not address the standing issue, particularly given the split of authority and the Supreme Court's upcoming decision, because there are independent reasons to deny Defendant's challenge to the search of the rental car.  From the outset of the traffic stop, Trooper Earrey, a trained and

---

[14] Here, Defendant testified that his girlfriend gave him permission to drive the car that day, but under the rental agreement, it does not seem that she had authority to do so, and even if she did, she testified that she did not give him permission to transport drugs or guns in the car.  (Tr. 38; Def.'s Ex. 1 at 2 ("No 'Additional Authorized Operators' Without Our Prior Written Approval.").)

19

experienced drug interdiction officer, smelled marijuana, which gave him probable cause to believe that Defendant possessed marijuana and that a search of the car would yield evidence of that crime.  As such, the search of the car was permissible under the "automobile exception" to the Fourth Amendment's warrant requirement.

"For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime."  *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011).  "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances."  *Id.* at 1300.  "It is well established that the smell of marijuana allows the warrantless search of . . . vehicles[.]"  *United States v. Barnett*, No. 2:08-cr-100-FtM-29SPC, 2009 WL 426023, at *1 (M.D. Fla. Feb. 19, 2009) (citing *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir.1991) (en banc)); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) (finding that the smell of marijuana coming from a package gave rise to probable cause to believe that a crime had been committed); *United States v. Arrasmith*, 557 F.2d 1093, 1094 (5th Cir. 1977) (per curiam) ("The odor of marijuana provided probable cause, authorizing the search."); *United States v. Diaz*, 541 F.2d 1165 (5th Cir. 1976) (per curiam) (finding that "after the border patrol agent smelled the strong odor of marijuana [emanating from the car],

probable cause had been properly established"); *United States v. Santibanez*, 517 F.2d 922, 923 (5th Cir. 1975) (per curiam) ("The odor of marijuana emanating from the vehicle's interior gave the immigration officer probable cause to then conduct the search.").

Thus, the smell of marijuana alone gave Trooper Earrey grounds for detaining Defendant and searching the rental car.  Defendant claims that the trooper perjured himself when he testified under oath that he smelled marijuana in the rental car.  However, if Trooper Earrey lied on the witness stand (and in his written report), he also lied *prior to* the search when he was talking aloud to himself about the reasons that he was suspicious of Defendant (*see* Gov's Ex. 1 at 7:00-7:30), and when he was talking to Trooper Finley on the phone (*see* Gov's Ex. 1 at 16:25-17:05).  Having heard the trooper's testimony, seen his demeanor in Court, evaluated his motives, and received the video of the events in question, the Court declines to accept Defendant's claim of perjury.

Trooper Earrey also testified that he saw little remnants of marijuana around the gearshift center console area (Tr. 11), which further supported a finding of probable cause to search the car and detain Defendant.  Defendant finds it significant that Trooper Earrey did not mention the presence of marijuana remnants when he was talking out loud in his patrol car or during his conversation

with Trooper Finley.[15]  Again, the Court does not find any basis to discredit Trooper Earrey's testimony.  Even assuming that the trooper did not see the remnants until later, there was enough evidence for the trooper to investigate further.

The additional evidence of possible wrongdoing that the trooper perceived, which strengthened the case for conducting a search, included: Defendant's driving behavior – specifically, in response to the trooper's pursuit, Defendant darted into the restaurant parking lot and got out of the car quickly; Defendant's position outside the rental vehicle suggested that he was messing with something on the floorboard (where the troopers later found a bag of Ecstasy), instead of staying in the vehicle with his license and rental agreement ready; Defendant's report that he was getting food for his son even though there was already food in the car; driving a rental car that was not in his name; and Defendant's nervousness – he was sweating, his hands were shaking, and the artery in his neck was pulsating.

Within minutes, additional facts became known, all before the search was conducted: a routine criminal history check showed that Defendant had a history of drug and weapons charges; Defendant was eager to cut the traffic stop short by offering to peel off the window tint; a pat-down of Defendant indicated he was

---

[15] Trooper Earrey mentioned the remnants in his written report and during his testimony in Court.

carrying a large wad of cash; and when he was asked to sit in the trooper's car,

Defendant tried to escape by initially using his son as a shield and then fighting

the troopers.  In sum, there was ample evidence to give the troopers probable

cause to believe that a search of the rental car would yield evidence of a crime.

Therefore, the search of the rental car was lawful.

> **C.    Because There Was Probable Cause (or at a Minimum, Reasonable Suspicion) to Believe that Defendant Possessed Marijuana from the Outset of the Stop, the Troopers Were Justified in Extending the Stop**

Defendant's next argument is that the troopers unreasonably prolonged the

duration of the traffic stop.  Defendant cites to *Rodriguez v. United States*, 135

S.Ct. 1609 (2015), where the Supreme Court stated in relevant part:

> Like a *Terry* stop, the tolerable duration of police inquiries in the
> traffic-stop context is determined by the seizure's "mission"—to
> address the traffic violation that warranted the stop, . . . and attend to
> related safety concerns . . . .  Because addressing the infraction is
> the purpose of the stop, it may "last no longer than is necessary to
> effectuate th[at] purpose." . . .  Authority for the seizure thus ends
> when tasks tied to the traffic infraction are—or reasonably should
> have been— completed.

*Id.* at 1614.  The Court stated that an officer conducting a traffic stop "may

conduct certain unrelated checks during an otherwise lawful traffic stop," but "he

may not do so in a way that prolongs the stop, absent the reasonable suspicion

ordinarily demanded to justify detaining an individual."  *Id.* at 1615.  Included

among those unrelated checks are "ordinary inquiries incident to [the traffic]

stop," such as "checking the driver's license, determining whether there are

outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* "The reasonableness of a seizure . . . depends on what the police in fact do." *Id.* at 1616. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" *Id.* "[A] traffic stop 'prolonged beyond' that point is 'unlawful.'" *Id.*

Defendant argues that Trooper Earrey made little effort to complete the paperwork associated with the stop and, instead, acted in a manner consistent with a fishing expedition. However, as stated earlier, from the outset of the stop, Trooper Earrey had probable cause (or at least reasonable suspicion) to believe that Defendant possessed marijuana and that a search of the car would reveal evidence of that crime. As such, Defendant did not have "a right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed." *United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002). Even if Trooper Earrey only had reasonable suspicion that Defendant possessed marijuana, he was allowed to detain Defendant in order to investigate further. *See Rodriguez*, 135 S.Ct. at 1615 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, *absent the reasonable suspicion ordinarily demanded to justify detaining an individual*.") (emphasis added).

24

Under similar circumstances, the district court for the Southern District of

Georgia found that unreasonable delay was not an issue because "the officer had

probable cause to search from the outset of the traffic stop." *United States v.*

*Murray*, No. CR410-266, 2011 WL 1806983, at *4 n.9 (S.D. Ga. Mar. 16, 2011)

(report and recommendation adopted as modified, 2011 WL 1806971 (S.D. Ga.

May 11, 2011).)  The court in *Murray* stated:

> Upon approaching the driver of the Malibu, Officer Acosta testified
> that he immediately smelled the strong odor of marijuana coming
> from the vehicle.  This observation alone furnished probable cause to
> search the vehicle. . . . At the very least, it provided reasonable
> suspicion to believe that Murray was engaged in criminal activity and
> that marijuana residue was inside the vehicle . . . , a suspicion that
> blossomed into probable cause upon Murray's admission that he had
> just smoked a joint. . . . Based upon the hearing testimony and the
> video, the Court is satisfied that Acosta smelled marijuana coming
> from the car even if he didn't play that card until later in his
> conversation with Murray.  Accordingly, Acosta did not unreasonably
> prolong the traffic stop in order to obtain a justification to search the
> vehicle.

*Id.* at *4.

Here, Trooper Earrey smelled marijuana at the outset of the traffic stop,

which gave him probable cause to search the car and detain Defendant.  As

such, the normal time limits for traffic stops do not apply.  *See Gonzalez*, 2009

WL 3230787 at *3 ("[M]uch of the duration of the traffic stop was after the officer

had probable cause to believe defendant was committing other offenses.  Within

the first few minutes of the traffic stop, the officer developed probable cause to

believe defendant was driving on a suspended license, an arrestable offense

25

under Florida law.").  Under these circumstances, Defendant's "undue delay" argument must fail.

### D. Defendant's Statements to Law Enforcement Are Admissible

Finally, Defendant argues that the Court must suppress his statements to the troopers because he was subjected to an illegal stop, detention, and search. However, as shown above, the stop, detention, and search were all lawful.  As such, there are no grounds to suppress Defendant's statements.

Accordingly, it is respectfully **RECOMMENDED** that the Motion (**Doc. 30**) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on March 16, 2018.


MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE


Copies to:

The Honorable Harvey E. Schlesinger
Senior United States District Judge

Counsel of Record

26